[No. C011114. Third Dist. Nov. 30, 1992.]

JO ANN MATHIS et al., Plaintiffs and Appellants, v.
JAMES D. MORRISSEY, Defendant and Respondent.

336

---

### COUNSEL

James F. Scott and Eugene Dong for Plaintiffs and Appellants.

Anderson, Galloway & Lucchese, Thomas J. Donnelly and Karen A. Sparks for Defendant and Respondent.

---

### OPINION

**SPARKS, Acting P. J.**—In this wrongful death/medical malpractice action we consider whether the trial court erred in refusing two special instructions, one concerning a physician's duty to inform the patient of different schools of thought on the proposed surgery and the other dealing with the burden of proof. For the reasons which follow, we conclude that the trial court correctly refused the special instructions. We also consider and reject the argument that an expert witness was disqualified because of asserted bias.

Plaintiffs, the heirs of decedent Gordon Mathis, appeal from a judgment entered on a jury verdict in favor of defendant James D. Morrissey, M.D.[1] Plaintiffs contend that the trial court erred in refusing two of their requested jury instructions and by permitting an expert witness to testify despite alleged bias. We shall affirm.

---

[1] The plaintiffs Jo Ann Mathis, Francine Bailey, Jennifer Johnson, Gordon Mathis, Jr., Jeweline Nichols, Lisa Darlene Mathis, Jay Paul Mathis, Amber Mathis and James Lyn Mathis are the surviving children of the decedent, Gordon Mathis, and plaintiffs Brenda Johnson, Starr Johnson, Destiny Johnson, Jeremy Johnson and Joshua Johnson are his grandchildren.

Plaintiffs brought this action against numerous health care providers. The appeal involves only the claim against defendant Morrissey, who performed surgery on plaintiffs' decedent.

## FACTS

Plaintiffs' decedent, Gordon Mathis, died in June 1983, approximately five and one-half months after undergoing arterial bypass surgery performed by defendant. At the time of his death decedent was 50 years of age. He had previously suffered two serious heart attacks (myocardial infarctions). His heart had suffered damage which necessitated the implantation of a pacemaker. His treating cardiologist testified decedent had multiple risk factors that increased his risk of suffering a fatal heart attack. These factors included a strong family history of early death from cardiovascular causes, diabetes, heavy smoking, hypertension, and marked arteriosclerosis. Two of decedent's three primary blood vessels to his heart were completely occluded and the third was 60 to 70 percent stenosed. Decedent told his cardiologist that he had almost died at the time of his second heart attack and that he felt his life was "hanging by a thread," a view with which the cardiologist agreed. Decedent said he wanted to undergo a surgical procedure in an effort to prolong his life.

Although it is not clear whether decedent was referred to defendant or made an appointment on his own,[2] he saw defendant, a heart surgeon, in early January 1983. Defendant performed coronary bypass surgery on decedent on January 11, 1983. Decedent contracted an infection, which is one of the risks of cardiac surgery, and ultimately, in June 1983, he died.

Plaintiffs do not argue that defendant was negligent in the manner in which he performed the surgery or in his postsurgery care of decedent. Instead, their claim against defendant is based upon the selection of surgery as the treatment option and on principles of informed consent. Their case was supported at trial by the testimony of Dr. John Schroeder, a professor of cardiology at Stanford University.

Dr. Schroeder explained that the primary means of treating cardiovascular problems are medical therapy, which involves changing habits and prescribing medicines, and surgical intervention. Since surgery itself involves risk, it is not indicated unless there is a countervailing benefit to be gained. If the

---

Our discussion of the facts will therefore be limited to Morrissey's involvement and alleged liability.

[2]Defendant believed that decedent was referred to him by the cardiologist and he sent the cardiologist a courtesy letter thanking him for the referral and outlining the surgical procedure he thought might be appropriate. The cardiologist did not believe he had made the referral and his office records indicate he was still in the process of evaluating the case at the time decedent saw defendant. It is clear that decedent was actively seeking surgical intervention at that time and it is entirely conceivable that he essentially referred himself to defendant without advising him that the cardiologist had played no part in the referral.

patient is suffering pain or functional deficits (such as shortness of breath) then surgery is indicated because in most cases it will relieve those symptoms. In the absence of pain or functional deficits the only reason for surgery would be to prolong the patient's life. Dr. Schroeder testified that at the time of trial there was data to suggest that surgical intervention can prolong life in such cases but that the data was not available at the time of decedent's surgery. Therefore, in Dr. Schroeder's view, surgery was not indicated for decedent at the time of the operation.[3] He opined that a surgeon contemplating surgery in such instances should at least have advised the patient: "Look, the arteries are blocked. We might be able to improve life expectancy, but there's no scientific proof currently available."

Defendant testified that in discussing surgery with decedent he would have told him that his exercise tolerance could improve to some extent but that it would be impossible to predict exactly how much. He would have told him that surgery could improve his chances of living longer but that there would be no specific guarantee. He would have discussed the risks associated with surgery. And he would have discussed the alternative, which was continued medical management.

Defendant presented the testimony of four medical doctors to establish that he did not commit malpractice in his treatment of decedent. The defense witnesses included two cardiovascular surgeons and two cardiologists, including decedent's treating cardiologist. These doctors testified that surgery was an appropriate treatment procedure in decedent's case even in the absence of a complaint of pain because it could reduce the risk of a future heart attack and enhance ventricular function. The jury returned a special verdict finding that defendant was not negligent. This appeal followed.

## DISCUSSION

### I. *Special Instructions*

■ A physician's duty of reasonable disclosure for purposes of consent to a proposed medical procedure was established in *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1]. There, as the high court later recounted, the *Cobbs* court articulated what have become "three well-established principles. First, a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or

---

[3]Defendant's records indicate that decedent complained of pain, but the treating cardiologist's records indicate that he did not. In any event, defendant testified that the surgery was performed in an attempt to decrease the risk of a fatal heart attack and to enhance ventricular function. The relief of pain was not a major consideration, and the absence of a complaint of pain would not have changed his recommendation.

not to submit to lawful medical treatment. Second, the patient's consent to treatment, to be effective, must be an informed consent. Third, in soliciting the patient's consent, a physician has a fiduciary duty to disclose all information material to the patient's decision." (*Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120, 129 [271 Cal.Rptr. 146, 793 P.2d 479], citations and internal quotation marks omitted.) In *Cobbs*, a doctor had proposed and obtained his patient's consent to a surgical procedure but had not explained the inherent risks involved. The Supreme Court held that in order for a doctor to obtain a patient's "informed consent" to a recommended therapy, the physician must provide a reasonable explanation of the procedure, its likelihood of success, and the risks involved in accepting or rejecting the proposed therapy. (*Cobbs* v. *Grant, supra,* at pp. 243-244.) As the court later observed in *Truman* v. *Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902], under *Cobbs* "[t]he scope of a physician's duty to disclose is measured by the amount of knowledge a patient needs in order to make an informed choice. All information material to the patient's decision should be given. [¶] Material information is that which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject the recommended medical procedure." (*Id.* at p. 291, citation omitted.)

If a doctor fails to make reasonable disclosure and a prudent person in the patient's position would have declined the procedure had disclosure been made, then the doctor may be held liable in negligence if the risks inherent in the procedure materialize. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 245.) "Beyond the foregoing minimal disclosure, a doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances." (*Id.* at pp. 244-245.) However, a "mini-course in medical science is not required."[4] (*Id.* at p. 244.)

In this case the trial court instructed the jury on informed consent using standard BAJI instructions: "It is the duty of a physician to obtain the consent of a patient before treating or operating on the patient. Such consent

---

[4]The *Cobbs* court also resolved the question of when the case should proceed under a negligence theory rather than battery. "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence." (*Cobbs* v. *Grant, supra,* 8 Cal.3d at pp. 240-241.)

may be express or may be implied from the circumstances. [¶] Except as hereinafter explained, it is the duty of the physician to disclose to the patient all material information to enable the patient to make an informed decision regarding the proposed operation or treatment. [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure. To be material a fact must also be one which is not commonly appreciated. [¶] There is no duty to make disclosure of risks when the patient requests that he or she not be so informed or where the procedure is simple and the danger remote and commonly understood to be remote. [¶] Likewise, there is no duty to discuss minor risks inherent in common procedures, when such procedures very seldom result in serious ill effects. [¶] However, when a procedure inherently involves a known risk of death or serious bodily harm it is the physician's duty to disclose to the patient the possibility of such outcome and to explain in lay terms the complications that might possibly occur. The physician or surgeon must also disclose such additional information as a skilled practitioner of good standing would provide under the same or similar circumstances. [¶] A physician has no duty of disclosure beyond that required of physicians of good standing in the same or similar locality when he or she relied upon facts which would demonstrate to a reasonable person that the disclosure would so seriously upset the patient that the patient would not have been able to rationally weigh the risks of refusing to undergo the recommended [operation]. [¶] Even though the patient has consented to a proposed operation, the failure of the physician to inform the patient as stated in this instruction before obtaining such consent is negligence and renders the physician subject to liability for any injury [legally] resulting from the [operation] if a reasonably prudent person in the patient's position would not have consented to the [operation] if he or she had been adequately informed of all the significant perils." (See BAJI Nos. 6.10 (7th ed. 1986 bound vol.) and 6.11 (1992 rev.) (7th ed. pocket pt.) [hereafter BAJI No. 6.10 and BAJI No. 6.11].) The court also instructed: "A Patient must be apprised not only of the risks inherent to the procedure prescribed, but also the risks of a decision not to undergo the treatment and the probability of a successful outcome of the treatment."

The trial court refused plaintiffs' special instruction No. 24, which read: "When surgery or other dangerous therapeutic procedures are being considered, the physician must inform the patient of the available alternatives or schools of thought and the hazards involved so that the patient is able to give effective consent to the proposed treatment." Plaintiffs, relying on the decision in *Jamison v. Lindsay* (1980) 108 Cal.App.3d 223 [166 Cal.Rptr. 443], contend that the court's refusal to give this instruction constitutes reversible error.

In *Jamison*, a surgeon sent a surgically removed cystic mass to a pathologist for analysis. The pathologist observed immature tissue in the mass and was aware that for many years there had been divergent opinions among pathologists as to whether immature tissue in a teratoma is potentially malignant. However, the pathologist identified the mass, both orally and in his written report, as a benign teratoma without disclosing either the presence of immature tissue or that some pathologists would consider the mass to be potentially malignant. The plaintiff was told the mass was benign, did not seek further treatment, and subsequently developed a malignancy. (108 Cal.App.3d at pp. 228-229.)

The *Jamison* trial court refused to instruct on informed consent and instead put the case to the jury under the standards ordinarily applied to claims of medical negligence. (108 Cal.App.3d at p. 229.) The Court of Appeal affirmed a resulting judgment in favor of the surgeon and pathologist, noting that since there was no postoperative treatment being recommended implied consent instructions were inapplicable. (*Id.* at p. 230.) "The informed consent theory and [plaintiff's] proposed instructions on the duty of a physician to disclose 'all relevant information to enable the patient to make an informed decision regarding the proposed . . . postoperative treatment' were inapposite to [defendants'] failure to tell her that her ovarian teratoma contained immature tissue and that some pathologists believed such tissue to be malignant or potentially malignant. [Plaintiff] had validly consented to surgery before anyone knew anything about the characteristics of the suspected tumor. After the surgery, [defendants] did not propose any therapy as to which [plaintiff] would have been entitled to make an informed decision. The instructions proposed by [plaintiff], though stating the law correctly . . . were not applicable to the evidence presented." (*Id.* at pp. 230-231.) ▬▬ ▬ ▬ Nevertheless, the *Jamison* court stated in dictum that it would have been appropriate to instruct the jury that a physician or surgeon has a duty to disclose all relevant information to enable the patient to make an informed decision whether to seek additional treatment following surgery, but found no duty to so instruct in the absence of request.[5] (*Id.* at p. 231.)

The *Jamison* case presented unusual circumstances because no postoperative surgery or other treatment was undertaken and thus the issue of the

---

[5]As the *Jamison* court later made clear, the duty of disclosure rests with the primary physician and not with the consulting pathologist. "To impose a duty on a consulting pathologist to communicate with the patient regarding his evaluations would create an undue burden on the pathologist and could also be disruptive of the primary physician's relation with his patients." (*Mahannah* v. *Hirsch* (1987) 191 Cal.App.3d 1520, 1527-1528 [237 Cal.Rptr. 140]; accord, *Townsend* v. *Turk* (1990) 218 Cal.App.3d 278, 286-287 [266 Cal.Rptr. 821] [consulting radiologist].)

patient's consent to such a subsequent procedure never arose. (See *Vandi* v. *Permanente Medical Group, Inc.* (1992) 7 Cal.App.4th 1064, 1071, fn. 5 [9 Cal.Rptr.2d 463]; *Scalere* v. *Stenson* (1989) 211 Cal.App.3d 1446, 1451 [260 Cal.Rptr. 152].) Nevertheless, the *Jamison* court suggested that a special instruction would have been appropriate upon request because in the unusual circumstances of the case no "duty of disclosure" instructions were otherwise given and the case was submitted solely under general negligence instructions. ██ ██ The *Jamison* court did not attempt to add to or expand upon general BAJI duty-of-disclosure instructions, but merely opined that in appropriate circumstances those instructions could be applied to a situation involving possible additional treatment following surgery.[6] The instruction suggested by the *Jamison* court for such circumstances was in fact entirely consistent with the standard BAJI duty-of-disclosure instructions and the *Jamison* decision in no way suggests that those instructions are inadequate where informed consent is at issue.

 We do not find the informed consent instructions given by the court to have been inadequate in this case. It is a general rule that "[a] difference of medical opinion concerning the desirability of one particular medical procedure over another does not, however, establish that the determination to use one of the procedures was negligent." (*Clemens* v. *Regents of University of California* (1970) 8 Cal.App.3d 1, 13 [87 Cal.Rptr. 108].) Rather, "different doctors may disagree in good faith upon what would encompass the proper treatment or diagnosis of a medical problem in a given situation. Medicine is not a field of absolutes. There is not ordinarily only one correct route to be followed at any given time. There is always the need for professional judgment as to what course of conduct would be most appropriate with regard to the patient's condition. [I]t is for the doctor to use his best judgment to pick the proper one." (*Barton* v. *Owen* (1977) 71 Cal.App.3d 484, 501-502 [139 Cal.Rptr. 494].)

---

[6]The *Jamison* decision is usually relied upon in cases where the patient maintains that a doctor should have but did not recommend a particular procedure. As the court noted, the "[n]egligent failure to advise a patient to pursue a potentially necessary course of treatment is actionable under ordinary medical negligence standards, . . ." (108 Cal.App.3d at p. 231.) In such cases the plaintiff often argues alternatively, again in reliance upon *Jamison*, that the doctor at least had a duty of disclosure with respect to the nonrecommended procedure. The Courts of Appeal, including this court, have held that the failure to recommend a procedure must be addressed under ordinary medical negligence standards and have rejected a general duty of disclosure with respect to nonrecommended procedures. (*Vandi* v. *Permanente Medical Group, Inc., supra,* 7 Cal.App.4th at p. 1070; *Atkins* v. *Strayhorn* (1990) 223 Cal.App.3d 1380, 1388 [273 Cal.Rptr. 231]; *Townsend* v. *Turk, supra,* 218 Cal.App.3d at p. 287; *Munro* v. *Regents of University of California* (1989) 215 Cal.App.3d 977, 986-987 [263 Cal.Rptr. 878]; *Scalere* v. *Stenson, supra,* 211 Cal.App.3d at pp. 1449-1453.) In *Vandi, supra,* we rejected a general duty of disclosure with respect to nonrecommended procedures, but we did indicate that in unusual circumstances the imposition of such a duty may be appropriate. (7 Cal.App.4th at p. 1071.)

When a doctor recommends a particular procedure then he or she must disclose to the patient all material information necessary to the decision to undergo the procedure, including a reasonable explanation of the procedure, its likelihood of success, the risks involved in accepting or rejecting the proposed procedure, and any other information a skilled practitioner in good standing would disclose to the patient under the same or similar circumstances. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at pp. 243-244.) The instructions given by the court in this case fully and adequately instructed the jury with respect to this duty of disclosure. As plaintiffs recognize, reversal of a judgment may not be based upon the failure to give particular instructions if the point is covered adequately by instructions which were given. (*Johns* v. *Ward* (1959) 170 Cal.App.2d 780, 789 [339 P.2d 926].) This is such a case.

In any event, the evidence did not establish a different "schools of thought" situation. Defendant and his experts testified that the procedure he performed was appropriate in an effort to improve ventricular function and to enhance life expectancy. Plaintiffs' expert testified that at the time there was no statistical data available to establish that the procedure would enhance life expectancy and therefore that was not an appropriate reason for the procedure. This evidence relating to the selection of surgery as the treatment option is governed by ordinary standards of medical negligence and does not involve informed-consent principles.

Once a doctor has made a treatment decision then the fact that other doctors would disagree or that there are other schools of thought on the correct treatment may be material information which should be disclosed to the patient in obtaining consent to the procedure. For example, assume for purposes of illustration that there are two schools of thought concerning the optimum treatment for breast cancer. One school posits that a mastectomy is the appropriate procedure, while the other asserts that a lumpectomy followed by radiation is the preferred treatment. Assume further that an explanation of these two differing methods of treatment constitutes material information for the purposes of informed consent.[7] As we have noted, the mere fact that there is a disagreement within the relevant medical community does not establish that the selection of one procedure as opposed to the other constitutes ordinary medical negligence. Since competent physicians regularly use both procedures, a patient would face an insuperable task in

---

[7]In point of fact, the Legislature has mandated that physicians furnish breast cancer patients with written information on the alternative methods of treatment. "The failure of a physician and surgeon to inform a patient by means of a standardized written summary, . . . in layman's language and in a language understood by the patient of alternative efficacious methods of treatment which may be medically viable, including surgical, radiological, or chemotherapeutic treatments or combinations thereof, when the patient is being treated for any form of breast cancer constitutes unprofessional conduct . . . ." (Health & Saf. Code, § 1704.5.)

establishing medical malpractice, i.e., that the specialist failed "to have the knowledge and skill ordinarily possessed, and to use the care and skill ordinarily used, by reputable specialists practicing in the same field and in the same or a similar locality and under similar circumstances." (BAJI No. 6.01 (1991 rev.) (7th ed. pocket pt.).) On the other hand, the oncologist or other specialist would have a duty under these hypostatized circumstances to disclose the two recognized schools of treatment so that the patient could be sufficiently informed to make the final, personal decision. As the *Cobbs* court explained, "[a] medical doctor, being the expert, appreciates the risks inherent in the procedure he is prescribing, the risks of a decision not to undergo the treatment, and the probability of a successful outcome of the treatment. But once this information has been disclosed, that aspect of the doctor's expert function has been performed. The weighing of these risks against the individual subjective fears and hopes of the patient is not an expert skill. Such evaluation and decision is a nonmedical judgment reserved to the patient alone." (*Cobbs* v. *Grant, supra*, 8 Cal.3d 229, 243.) Under this hypothetical then, the failure to disclose such material information would deprive the patient of the opportunity to weigh the risks and thus would violate the physician's duty of disclosure. In terms of the standard instruction, such a violation "is negligence and renders the physician subject to liability for any injury resulting from the [treatment] [operation] if a reasonably prudent person in the patient's position would not have consented to the [treatment] [operation] if [he] [or] [she] had been adequately informed of all the significant perils." (BAJI No. 6.11.)

But the standard instructions on informed consent utilized by the court in this case were adequate to put the question of informed consent, and its component of material information, before the jury. By adding the requirement of informing the patient of "schools of thought," plaintiffs' suggested instruction would go further and impose liability upon a physician as a matter of law for the failure to inform a patient of the possible views of other health care providers merely because at trial and in hindsight an expert disagreed with the defendant's treatment decision. Such a result is not supported by any authority and would impose an excessively onerous burden upon treating physicians. What the duty of disclosure requires for purposes of informed consent is the divulgence of material information, not necessarily the revelation of the existence of various schools of thought. The vice of plaintiffs' special instruction is that it requires the physician, as a matter of law, to disclose the existence of "schools of thought" without regard to whether such a disclosure would constitute "[m]aterial information . . . which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject the recommended medical procedure." (*Truman* v. *Thomas, supra*, 27

Cal.3d at p. 291.) Of course, a plaintiff is free to present expert evidence and argument that, as a factual matter, the existence of an opposing school of thought was material information that should have been disclosed. But that factual question is covered adequately by standard BAJI duty-of-disclosure instructions and it would be error for a trial court to give instructions that would impose liability upon a physician as a matter of law for the failure to anticipate and reveal the fact that some medical care providers may later disagree with the treating physician's medical recommendation. Thus, we find no error in the court's refusal to give plaintiffs' proposed special instruction No. 24.

██ The trial court also refused plaintiffs' special instruction No. 27, which provides: "The defendants did not disclose to deceased the risk and benefits of the operation for a patient who did not have angina chest pains. The defendants have the burden of proving by a preponderance of the evidence that this information was not material. [¶] If so, plaintiffs must prove by a preponderance of the evidence that a reasonable person in deceased's position would not have undergone the operation had he known the risks and benefits thereof." Plaintiffs contend that the failure to give this instruction was reversible error.

We find plaintiffs' special instruction No. 27 to be objectionable for several reasons. First, it is not supported by the record. Dr. Schroeder testified that the surgery performed by defendant has inherent risks. He did not testify that the risks are different depending upon whether the patient suffers angina. Defendant testified that he recommended the surgery to enhance ventricular function and decrease the risk of a fatal heart attack. In Dr. Schroeder's view those potential benefits were not sufficiently proven at the time to warrant undertaking the risks of the surgery. He testified that such an operation will relieve angina 95 percent of the time and that the relief of pain would have been a sufficient reason for performing the surgery. But for a patient such as decedent, who apparently was not complaining of angina and for whom the surgery was not recommended as a pain relief measure, the possibility that the surgery might relieve pain in someone who was suffering pain is not relevant. In Dr. Schroeder's testimony the absence of angina was an important point with respect to his opinion that defendant was negligent in proposing surgery for decedent, but it did not enter into the implied consent equation.

With respect to decedent the issue for determination was whether he was adequately advised of the potential benefits and risks of the surgery which were relevant to him, a nonangina patient. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at pp. 244-245.) Defendant presented evidence that decedent was appropriately advised of the risks and benefits of the surgery for a patient in his

circumstances. The instruction proposed by plaintiffs would have usurped the jury's role in evaluating this evidence by informing it that defendant had not so advised decedent. This would have the effect of a directed verdict on a disputed factual issue and would not have been proper in light of the conflicting evidence. (*Walker* v. *Northern San Diego County Hospital Dist.* (1982) 135 Cal.App.3d 896, 899-900 [185 Cal.Rptr. 617].)

Finally, the instruction proposed by plaintiffs would shift the burden of proof to defendant with respect to materiality. ■ In *Cobbs* v. *Grant*, *supra*, 8 Cal.3d at page 245, the high court said: "The burden of going forward with evidence of nondisclosure rests on the plaintiff. Once such evidence has been produced, then the burden of going forward with evidence pertaining to justification for failure to disclose shifts to the physician."

Under our law the burden of going forward with evidence does not operate to shift the burden of proof. (See Evid. Code, §§ 110, 115, 604, 606.) The burden of producing or "going forward" with evidence means the obligation of a party to produce evidence sufficient to avoid a ruling against him on the issue. (Evid. Code, § 110; 1 Witkin, Cal. Evidence (3d ed. 1986) § 128, p. 114.) When a party with the burden of producing evidence has produced relevant evidence on the issue then the matter is to be determined without regard to the burden of going forward with evidence. (Evid. Code, § 604.) The burden of proof remains with the party who had the burden in the first instance. (*Ibid.*) In a civil case the plaintiff has the burden of proof with respect to all facts essential to his or her claim for relief. (Evid. Code, § 500.) In light of these standards the statement in *Cobbs* which we have quoted above does not indicate that the burden of proof is shifted to the defendant upon introduction of evidence of nondisclosure.[8]

Plaintiffs' proposed instruction also equates "materiality" with "justification" as used in *Cobbs*. In fact, materiality is intricately and necessarily bound up in the concept of nondisclosure. It is in fact the measure of the duty of disclosure. (*Cobbs* v. *Grant*, *supra*, 8 Cal.3d at p. 245.) Absent proof of materiality a plaintiff cannot meet the burden of going forward with evidence of nondisclosure in any relevant manner. In contrast, justification

---

[8]In some unusual factual circumstances our Supreme Court has seen fit to shift the burden of proof to a tort defendant upon a certain showing by the plaintiff. (See *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 773 [91 Cal.Rptr. 745, 478 P.2d 465]; *Summers* v. *Tice* (1948) 33 Cal.2d 80, 86 [199 P.2d 1, 5 A.L.R.2d 91].) In such instances the court has expressly said that the burden of proof and not merely the burden of producing evidence has been shifted, and has been careful to set forth the considerations of "policy and justice" which support such a result. (*Ibid.*) In *Cobbs*, the court did not say that the burden of proof shifted to the defendant and did not specify any policy considerations that would support such a result. (8 Cal.3d at p. 245.)

presupposes conduct which would otherwise constitute a breach of duty but permits the actor to escape liability by establishing that his conduct was warranted under the circumstances. (*Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 622-624 [327 P.2d 897]; *Satterlee* v. *Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 588-589 [177 P.2d 279] [disapproved on another ground in *Alarid* v. *Vanier, supra,* at pp. 622-624]; see also *People* v. *Frye* (1992) 7 Cal.App.4th 1148, 1154-1155 [10 Cal.Rptr.2d 217]; *People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1188 [264 Cal.Rptr. 167].) It appears that the *Cobbs* court was referring to justification in its usual sense because immediately after saying that the defendant has the burden of going forward with evidence of justification the court said: "Whenever appropriate, the court should instruct the jury on the defenses available to a doctor who has failed to make the disclosure required by law." (8 Cal.3d at p. 245.) We are satisfied that the decision in *Cobbs* does not stand for the proposition that the defendant bears the burden of proof with respect to materiality.[9]

In support of their argument the plaintiffs cite *Hutchinson* v. *U.S.* (9th Cir. 1988) 841 F.2d 966. In *Hutchinson,* the court made the same errors that plaintiffs make here. The court correctly cited *Cobbs,* but then erroneously equated justification with materiality and the burden of producing evidence with the burden of proof. (841 F.2d at p. 967.) From our previous discussion it should be apparent that we cannot agree with the *Hutchinson* interpretation of *Cobbs* and we decline to perpetuate what we perceive as its error by following it here.

## II. *The Biased Witness*

One of defendant's expert witnesses was Dr. Stephen Lipnik, who practices cardiology in Fresno. Plaintiffs assert that Dr. Lipnik is insured by the same malpractice insurer as defendant, Norcal Mutual Insurance Company. A mutual insurance company is an insurance corporation without capital stock which is owned by its policyholders collectively. (Ins. Code, § 4010.) Policyholders have a right to vote for directors and may receive a dividend if the company has funds in excess of a surplus equivalent to the aggregate of paid-in capital and unassigned surplus required for the issuance of a certificate of authority to a capital stock insurer transacting the same class of

---

[9]We note that under our law justification is regarded as an affirmative defense and that the defendant normally bears the burden of proof with respect to affirmative defenses. (Evid. Code, § 500; *Bartosh* v. *Banning* (1967) 251 Cal.App.2d 378, 386 [59 Cal.Rptr. 382].) When the *Cobbs* court's reference to justification is confined to its usual sense then it would not be erroneous to say that the defendant bears the burden of proof. This is not because the *Cobbs* court purported to shift the burden of proof, but is simply the burden normally imposed upon a defendant in a civil action under our law. The error in plaintiffs' proposed instruction arises from the combined effect of equating justification with materiality and equating the burden of going forward with evidence with the burden of proof.

insurance. (Ins. Code, §§ 4010, 4050.) Plaintiffs maintain that this gave Dr. Lipnik a financial interest in the outcome of the malpractice action against defendant and that for this reason he should have been precluded from testifying.

Initially, we note that plaintiffs do not, and cannot, contend that the court should have permitted them to impeach Dr. Lipnik with evidence of bias. (See Evid. Code, § 780, subd. (f).) Prior to trial defendant properly moved to exclude evidence of his insurance coverage under Evidence Code section 1155 and on grounds that evidence of insurance coverage would create a substantial danger of undue prejudice and of confusing the issues under Evidence Code section 352. Plaintiffs did not oppose the motion and made no attempt to impeach Dr. Lipnik with evidence of his malpractice insurance coverage. Since plaintiffs did not proffer evidence of Dr. Lipnik's malpractice insurer for impeachment purposes at trial they cannot complain on appeal that they were not allowed to impeach him with this evidence. (Evid. Code, § 354, subd. (a); *Pacific Gas & Elec. Co.* v. *Hacienda Mobile Home Park* (1975) 45 Cal.App.3d 519, 530-531 [119 Cal.Rptr. 559].)

■ Before trial plaintiffs did move to preclude Dr. Lipnik from testifying based upon the claim that he and defendant have the same insurance carrier. While plaintiffs may properly raise the denial of this motion on appeal, it is meritless. "Except as otherwise provided by statute, every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter." (Evid. Code, § 700.) A pecuniary interest in litigation, even a direct and substantial one, will not disqualify a person as a witness. (*Ripperdan* v. *Weldy* (1906) 149 Cal. 667, 672 [87 P. 276]; *Estate of Reynolds* (1949) 94 Cal.App.2d 851, 855-856 [211 P.2d 608].) It follows ipso facto that the trial court would have erred in precluding Dr. Lipnik from testifying based upon the indirect and tenuous financial interest asserted by plaintiffs.

DISPOSITION

The judgment is affirmed.

Scotland, J., and Raye, J., concurred.