[No. A063310. First Dist., Div. Three. Apr. 27, 1995.]

DOUGLAS SPANN et al., Plaintiffs and Appellants, v.
IRWIN MEMORIAL BLOOD CENTERS OF THE SAN FRANCISCO
MEDICAL SOCIETY, INC., et al., Defendants and Respondents.

[No. A063310. First Dist., Div. Three. Apr. 27, 1995.]

DOUGLAS SPANN, as Personal Representative, etc., Plaintiff and
Appellant, v.
IRWIN MEMORIAL BLOOD CENTERS OF THE SAN FRANCISCO
MEDICAL SOCIETY, INC., et al., Defendants and Respondents.

### Counsel

Michael James Moriarty for Plaintiffs and Appellants.

Charles Bond, Jacquelyn E. Gentry, Stefanie Gandolfi, O'Connor, Cohn, Dillon & Barr, Duncan Barr and Thomas G. Manning for Defendants and Respondents.

### Opinion

CHIN, P. J.—In October of 1984 Sherrie Spann received an infusion of more than 130 units of blood plasma and platelets as treatment for a life-threatening blood disease known as thrombotic thrombocytopenic purpura (TTP). Although the treatment regimen was apparently successful, Ms. Spann contracted human immunodeficiency virus (HIV) from the infused blood products; she died in May of 1990 from complications due to acquired immune deficiency syndrome (AIDS).

Ms. Spann's husband, Douglas Spann, sued the Kaiser Foundation Hospital (Kaiser), the Permanente Medical Group, Inc. (Permanente), Irwin Memorial Blood Centers of the San Francisco Medical Society, Inc., and the

San Francisco Medical Society (Irwin), for the wrongful death of his wife.[1] The trial court granted a motion to compel arbitration and to stay the action with respect to Kaiser and Permanente. However, the court permitted Mr. Spann to pursue his lawsuit against Irwin on his causes of action for professional negligence and failure to obtain informed consent.

Irwin subsequently filed a motion for summary judgment. The trial court granted the motion as to Mr. Spann's cause of action for professional negligence. Mr. Spann then filed a motion for reconsideration and for new trial, arguing, inter alia, that the evidence was sufficient to support a cause of action for failure to obtain informed consent. The trial court entered judgment in favor of Irwin and denied the motion for reconsideration and for new trial. This timely appeal followed.

On appeal, we conclude the trial court properly granted summary judgment on the causes of action for professional negligence and failure to obtain informed consent alleged against Irwin. Consequently, we affirm the judgment.

## I. FACTS

A trial court may grant summary judgment only where there is no triable issue of material fact and the documents presented by the moving party are sufficient to sustain a judgment in its favor. Where, as here, the moving party is the defendant, it must either negate an essential element of the plaintiff's case or state a complete defense. (*Empire West* v. *Southern California Gas Co.* (1974) 12 Cal.3d 805, 808 [117 Cal.Rptr. 423, 528 P.2d 31]; *Valdez* v. *City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1050 [282 Cal.Rptr. 726].) In reviewing a summary judgment, we strictly construe the moving party's declarations and liberally construe those of the responding party. (*Valdez* v. *City of Los Angeles, supra*, 231 Cal.App.3d at p. 1050.) Our review of the record discloses the following facts.

In October of 1984, doctors at Kaiser Hospital in Vallejo diagnosed Ms. Spann as having TTP. TTP is a blood disorder which affects red blood cells. In its acute phase TTP is a medical emergency; without treatment, a TTP patient may die in a matter of weeks. One study found that in 1966 more than two-thirds of TTP patients died within ninety days of the onset of symptoms.

---

[1]Suit was initially filed for personal injuries on behalf of Sherrie and Douglas Spann while Ms. Spann was still alive. After Ms. Spann died, Mr. Spann filed suit for wrongful death. Ultimately, both cases were consolidated, and Mr. Spann was named as a plaintiff in his individual capacity and as guardian ad litem for his children. Because the capacity of the various plaintiffs is not important to the issues on appeal, we refer to Mr. Spann as if he were the sole plaintiff.

By 1984, however, TTP could be successfully treated with a process known as "plasmapheresis." Plasmapheresis is a method for separating the liquid portion of blood—plasma—from the blood cells suspended in the plasma. To accomplish this, blood is removed from the patient and circulated through a machine where the blood is "spun down" to separate the plasma from the cells. Another fluid, usually fresh frozen plasma, is then added to the cells, and the mixture is returned to the patient.

In early October of 1984, Ms. Spann was transferred to Kaiser Hospital in San Francisco to receive plasmapheresis and hemodialysis treatment. It is undisputed that before Ms. Spann underwent plasmapheresis both she and her husband were aware there was a risk of contracting AIDS from blood transfusions.[2] In addition, Ms. Spann's treating physician at Kaiser San Francisco—Dr. Weil—spoke with Mr. Spann and, according to Mr. Spann, told him there was a "one-in-a-million" possibility of contracting AIDS through plasmapheresis. It is disputed whether Dr. Weil disclosed the risk of transfusion AIDS directly to Ms. Spann.[3] According to Mr. Spann, Dr. Weil said that only about 20 units of blood products would be needed for the plasmapheresis. As it turned out, this was a substantial underestimate.

Irwin and its staff performed Ms. Spann's plasmapheresis at the Kaiser Hospital in San Francisco. Ms. Spann underwent eight separate plasmapheresis procedures from October 5 to October 12, 1984. Altogether, she received more than 130 units of plasma and separate infusions of platelets. Before each procedure Irwin's staff provided Ms. Spann with a patient information sheet that explained the process and risks of plasmapheresis. In particular, the information sheet explained that if fresh plasma were used in the process, there was a "slight possibility you may contract hepatitis. However, the blood bank has taken all possible precautions to insure that plasma is free of hepatitis." The information sheet did *not* list AIDS or HIV

---

[2] In particular, Mr. Spann stated in a declaration that because his wife was in the medical field (as a dietitian), she "was concerned about treatment involving the use of blood or blood products which were collected from donors located in San Francisco because she was concerned that AIDS might be transmissible in blood and did not wish to involve herself in any procedure that would increase any risk to her." In her deposition testimony, Ms. Spann said she was concerned about receiving blood products because of the "[p]otential risk of exposure to AIDS." According to Ms. Spann, by October of 1984 "[e]veryone in the Bay Area had heard of [AIDS]," and by that time she was aware the disease could be transmitted through blood. In his deposition testimony, Mr. Spann admitted that by the time his wife was admitted to Kaiser San Francisco, he knew there was a possibility AIDS could be transmitted via blood transfusions.

[3] In his deposition, Dr. Weil testified that by October of 1984 it was his "custom" to inform his patients about the risk of AIDS from transfusions. However, he had no specific recollection of disclosing this information to Ms. Spann. For his part, Mr. Spann claimed he was with his wife during the entire time she was at Kaiser San Francisco and that no physician discussed with her "the risks of her procedures or any alternatives for treatment."

infection as a risk of plasmapheresis. Before each plasmapheresis Ms. Spann, her husband, or one of her parents signed a consent form, which stated: "I understand the risks and problems of this procedure."

Ms. Spann received her last plasmapheresis treatment on October 12, 1984. Although the treatment regimen was apparently successful, Ms. Spann contracted HIV from the infused blood products. In May of 1990 she died from complications due to AIDS.

### Irwin's Motion for Summary Judgment

With respect to Irwin, Mr. Spann alleged causes of action based on, inter alia,[4] professional negligence (i.e., medical malpractice) and failure to obtain informed consent. Irwin's motion for summary judgment claimed that Irwin's conduct complied with the standard of care applicable to blood banks in 1984 for collecting blood and providing plasmapheresis. This claim was supported by an expert's declaration that Irwin had conformed to the applicable standard of care. Consequently, Irwin argued it was not professionally negligent.

Mr. Spann's opposition to summary judgment focused primarily on the issue of informed consent, and in particular on Irwin's alleged failure to notify Ms. Spann of the general risk of infection and the specific risk of AIDS infection from plasmapheresis. The opposition also suggested that Irwin was negligent because it failed to institute "donor reduction programs" to reduce the number of donors to whom a patient is exposed. The factual basis for Mr. Spann's opposition rested on the deposition testimony of a single expert witness: Dr. Joseph Feldschuh. In his deposition, Dr. Feldschuh claimed that because Irwin provided plasmapheresis directly to Ms. Spann, its duties "went beyond the usual blood bank duties," and it had an independent (and perhaps primary) duty to obtain Ms. Spann's informed consent. Dr. Feldschuh testified that Irwin's informed consent form for plasmapheresis was "totally deficient" because it did not (1) disclose the "high" possibility of contracting a general infection from the procedure itself; and (2) did not explain what steps could be taken to reduce the risk of infection, such as a donor reduction program.[5] However, Dr. Feldschuh did not fault Irwin for specifically failing to mention the risk of AIDS in the form.

---

[4]Although Mr. Spann alleged other causes of action against Irwin, he does not claim that those causes of action survived summary judgment, and does not point to any evidence to support them. Consequently, we mention them only in passing. (See *Osborn* v. *Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 263, fn. 7 [7 Cal.Rptr.2d 101].)

[5]Dr. Feldschuh also postulated that the plasmapheresis was a "less common form of therapy" than massive doses of steroids for "ITP." Dr. Feldschuh may have been confusing "ITP," idiopathic thrombocytopenic purpura, with TTP. ITP is characterized by platelet

With respect to the issue of a donor reduction program, Dr. Feldschuh could not name a single blood bank in the United States that was offering a donor reduction program in 1984 for patients receiving plasmapheresis for TTP. Nor could Dr. Feldschuh identify a single document dating from 1984 or before that discussed the kind of donor reduction program he advocated. Finally, Dr. Feldschuh admitted that neither the American Association of Blood Banks nor the Food and Drug Administration required community blood banks to provide a system of directed donations in 1984.

Based on this evidence, the trial court granted the motion for summary judgment, citing *Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th 234. In *Osborn,* the court held that whether a blood bank had taken appropriate steps to prevent the contamination of blood was a question of professional negligence which had to be decided by looking at the custom and practice *of the industry.* (*Id.,* at p. 282.) Thus, a blood bank could not be found negligent for failing to perform a test that no other blood bank in the nation was using. (*Ibid.*) The court further found that Irwin's expert had provided competent evidence that Irwin had met the industry standard of care in this case, while Dr. Feldschuh failed to provide testimony regarding the actual customs and practices of the blood banking industry in 1984.[6] Consequently, the trial court granted the motion as to the cause of action for professional negligence, but did not specifically mention the cause of action for failure to obtain informed consent.

Subsequently, Mr. Spann filed motions for reconsideration and new trial in which he argued there was sufficient evidence to survive summary judgment on a cause of action for lack of informed consent. The motion for reconsideration relied on evidence that had not been submitted in support of the original opposition to the motion for summary judgment. This new evidence included a declaration from Douglas Spann, a copy of Dr. Feldschuh's curriculum vitae, and a declaration from Dr. Feldschuh. The trial court denied the motions for reconsideration and for new trial, citing *Thai* v. *Stang* (1989) 214 Cal.App.3d 1264 [263 Cal.Rptr. 202] and *Blue Mountain Development Co.* v. *Carville* (1982) 132 Cal.App.3d 1005 [183 Cal.Rptr. 594]. This appeal followed.

---

destruction leading to grave bleeding. (Stedman's Medical Dict. (25th ed. 1990) pp. 1294-1295.) In any event, Dr. Feldschuh testified that he had "no criticism at all of the attempt to plasmapherese [Ms. Spann] in addition to giving her steroids as part of her treatment."

[6]Alternatively, the trial court found that Mr. Spann had failed to qualify Dr. Feldschuh as an expert.

## II.  Discussion

### A.  *The Cause of Action for Professional Negligence.*

In light of the rule articulated in *Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th 234, the cause of action for general *professional negligence* against Irwin clearly cannot survive summary judgment. Nevertheless, we briefly explain why summary judgment was proper on this cause of action, because it lays the groundwork for understanding Mr. Spann's primary argument, which is based on his cause of action for *lack of informed consent.*

■ In *Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th 234, Division Four of this district held that a blood bank is subject to a professional standard of care. Consequently, if a plaintiff alleges negligent failure to prevent transmission of the AIDS virus, the plaintiff must show that the blood bank failed to exercise the degree of care ordinarily exercised by other blood banks under similar circumstances. (*Id.,* at p. 272; see also *Wilson* v. *Irwin Memorial Blood Bank* (1993) 14 Cal.App.4th 1315, 1317 [18 Cal.Rptr.2d 517].)

The *Osborn* court stated that "the adequacy of a blood bank's actions to prevent the contamination of blood is a question of professional negligence and fulfillment of a professional standard of care. . . . [¶] This conclusion is consistent with most of the cases in other jurisdictions that have considered negligence claims against blood banks. ([Citations]; see also Comment (1989) 41 S.C.L.Rev. 107, 114 ['most courts only hold blood banks to a "professional" rather than a "reasonable man" standard of care'].) . . . [¶] Irwin was therefore required to exercise with respect to blood testing and donor screening 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised' by other blood banks 'under similar circumstances.' [Citations.]" (*Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th at pp. 271-272.)

In *Osborn,* the plaintiffs contended that Irwin should have started "anti-HBc surrogate testing for AIDS"[7] prior to February of 1983. (*Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th at pp. 247, 263.) The undisputed evidence showed that no blood banks ran such tests in January or

---

[7]Before scientists developed a reliable test for the HIV virus, it was discovered that an unusually large percentage of those with AIDS also tested positive for hepatitis B. That disease is diagnosed by running "anti-HBc tests for the antibody to the hepatitis B core antigen." Thus, it was proposed that blood banks should conduct anti-HBc tests and reject all blood that tested positive. (*Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th at p. 261.)

February of 1983. (*Id.*, at p. 275.) However, plaintiff's expert testified, in essence, that in his personal opinion blood banks *should* have instituted anti-HBc surrogate testing before February of 1983. (*Id.*, at p. 268.) In upholding a judgment notwithstanding the verdict in favor of Irwin on a cause of action for professional negligence, the *Osborn* court stated that the "question presented here is whether California law permits an expert to second-guess an entire profession" on the issue of professional negligence. (*Id.*, at p. 276.) The *Osborn* court concluded California law did not permit such "second-guess[ing]." Instead, the court held that ". . . Irwin cannot be found negligent for failing to perform tests that no other blood bank in the nation was using. Judgment notwithstanding the verdict was properly granted to Irwin on the issue of anti-HBc testing because there was no substantial evidence that" the test was accepted *practice* for blood banks in January and February of 1983. (*Id.*, at p. 282.)

*Osborn* controls this case on the applicable standard of care for professional negligence. ■ In moving for summary judgment, Irwin carried its initial burden of introducing expert testimony which showed that it had met the professional standard of care for administering plasmapheresis to a TTP patient.[8] Mr. Spann attempted to create a triable issue of fact on this point by relying on Dr. Feldschuh's personal opinion that Irwin *should* have offered a

---

[8]In his declaration, Irwin's expert stated that: "25. In October, 1984, it was not an accepted practice of health care providers providing plasmapheresis with plasma infusion to patients with TTP to provide the plasma needed during the procedure from directed donations. [¶] 26. Neither the Food and Drug Administration nor the American Association of Blood Banks required directed donations for any purpose in October, 1984, let alone for the treatment of TTP. [¶] 27. In October, 1984, the plasma and blood products used in the plasmapheresis procedures, including those of Sherrie Spann, came from Irwin's community blood donors. [¶] 28. Irwin's policy regarding directed donations by patients receiving plasma infusion during plasmapheresis for the treatment of TTP was in conformity with all American Association of Blood Banks and FDA standards and regulations and conformed to the accepted practices of health care providers providing this service to patients suffering from TTP. Irwin's plasmapheresis procedures met the standard of care applicable to blood banks in October, 1984. [¶] 29. I have reviewed both depositions of Dr. Feldschuh taken in preparation for the trial in this matter. I have reviewed those portions of his deposition transcript which refer to his opinion that Irwin should have offered Sherrie Spann a 'donor reduction program'. [¶] 30. In October, 1984, no blood bank or other health care provider providing plasmapheresis with plasma infusion to patients was obtaining plasma and blood products used in the procedure under a system of the kind recommended by Dr. Feldschuh. [¶] 31. In October, 1984, blood banks were not required to limit patient exposure to multiple donors in the fashion recommended by Dr. Feldschuh for any purposes. [¶] 32. In October, 1984, the American Association of Blood Banks was not recommending that Irwin provide blood to hospitals and patients under the plan recommended by Dr. Feldschuh. The American Association of Blood Banks has never recommended limiting patient exposure from multiple donors in the manner as described by Dr. Feldschuh in his deposition in this case. [¶] 33. Irwin's collection of blood for the purpose of providing plasma to Sherrie Spann for her treatment of TTP using plasmapheresis with plasma infusion met the standard of care applicable to health care providers in October, 1984. Irwin's care and treatment provided to

donor reduction program to patients undergoing plasmapheresis for TTP.[9] However, it is undisputed that in October 1984, no blood bank or other health care provider offered a "donor reduction program" for plasmapheresis patients. When pressed, Dr. Feldschuh could not name a single blood bank in the United States that was offering a "donor reduction program" of the type he advocated; nor could he specify a single document that recommended such a program in 1984.

We agree with the *Osborn* court that a single expert should not be permitted to "second-guess an entire profession" when it comes to establishing a professional standard of care. (*Osborn* v. *Irwin Memorial Blood Bank*, *supra*, 5 Cal.App.4th at p. 276.) Here, Dr. Feldschuh merely expressed his personal opinion of what the industry *should* have done in 1984. He did not state what the industry was *actually* doing at the time. Because a professional standard of care is established by the accepted industry practice, not the opinion of a single expert, Mr. Spann failed to create a triable issue of fact on this issue. Consequently, the trial court properly granted summary judgment on the cause of action for professional negligence.[10]

## B. *The Cause of Action for Failure to Obtain Informed Consent.*

Mr. Spann's primary argument is based on the doctrine of informed consent. ■ *Osborn* does not foreclose a cause of action based on a lack of informed consent because the duty to disclose risks of death, serious injury, or significant complications is *not* defined by the custom or practice of the medical community. Instead, such a potential peril must be divulged if it would be material to the patient's decision, regardless of the custom in the profession. (*Arato* v. *Avedon* (1993) 5 Cal.4th 1172, 1190-1191 [23

Sherrie Spann in October, 1984 conformed to the accepted practices of health care providers providing plasmapheresis with plasma infusion to patients suffering with TTP and conformed to both FDA and AABB guidelines, regulations and standards."

[9]As we understand it, Dr. Feldschuh's "donor reduction program" would have permitted Ms. Spann's family and friends to make directed donations of two units of plasma. This would have permitted Ms. Spann to select persons who were at minimal risk of contracting AIDS, and greatly reduced the number of donors to whom she was ultimately exposed.

[10]Mr. Spann makes much of the fact that, beginning in June 1984, Irwin instituted a general policy of allowing *directed* donations, but he was informed that directed donations were not available in Ms. Spann's case. He further claims that he had resources available through his work which would have permitted him to obtain a large number of directed donations. However, Irwin introduced evidence that its directed donations program was not intended to be used by patients undergoing plasmapheresis for TTP, apparently because of the large amount of blood required. Moreover, Mr. Spann's argument misses the mark. The issue is not whether Irwin *could* have supplied Ms. Spann with directed donations, but whether it was *required* to do so because this was the accepted practice in the industry. As we have indicated, there is no evidence that any blood bank utilized directed donations for TTP patients receiving plasmapheresis in 1984.

Cal.Rptr.2d 131, 858 P.2d 598]; *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 244-245 [104 Cal.Rptr. 505, 502 P.2d 1].) Consequently, Mr. Spann's failure to provide expert testimony on the industry practice or custom in this area is not fatal to his informed consent cause of action.

▪ Nevertheless, we believe Irwin was entitled to summary judgment on this cause of action for another reason. In our view, Mr. Spann has failed to raise a triable issue of fact that Irwin's failure to disclose the risk of AIDS *caused* Ms. Spann's injury.[11]

▪ In *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, the California Supreme Court held that a physician has a duty to disclose to a patient "the available choices with respect to proposed therapy and . . . the dangers inherently and potentially involved in each." (*Id.,* at p. 243.) Under *Cobbs,* the scope of a physician's duty to disclose is measured by the amount of knowledge a patient needs in order to make an informed choice. (*Id.,* at p. 245.) At minimum, a physician must disclose "the potential of death or serious harm" known to be inherent in a given procedure[12] and an explanation in lay terms of the complications that might occur. (*Id.,* at p. 244; see also *Arato* v.

---

[11]Irwin also contends that it had no duty to disclose any of the risks of plasmapheresis because it was at most a medical consultant, not the treating physician or therapist. Irwin relies on cases which held that pathologists and a radiologist who had no direct contact with patients had no independent duty to disclose known risks to those patients. (*Townsend* v. *Turk* (1990) 218 Cal.App.3d 278, 286 [266 Cal.Rptr. 821] [radiologist]; *Mahannah* v. *Hirsch* (1987) 191 Cal.App.3d 1520, 1527-1528 [237 Cal.Rptr. 140] [pathologists].) Those cases hold that "only those doctors who . . . actively managed the plaintiff's care (the therapists)" have a duty to disclose information. (*Townsend, supra,* 218 Cal.App.3d at p. 286.) Under this standard, a radiologist and pathologists who had no direct contact with patients had no duty to disclose, while an oncologist and the surgeon to whom he referred a patient both had a duty to disclose. (*Townsend, supra,* 218 Cal.App.3d at pp. 286-287; *Mahannah, supra,* 191 Cal.App.3d at pp. 1527-1528.)

In our view, it is a question of fact whether Irwin was a mere consulting expert in this case (akin to a radiologist or pathologist) or "shared joint responsibility" with Dr. Weil for managing Ms. Spann's care. (*Mahannah* v. *Hirsch, supra,* 191 Cal.App.3d at p. 1527.) Unlike the radiologist and pathologists discussed previously, Irwin's staff did have direct contact with the patient *and in fact attempted to obtain her informed consent before each procedure.* In these circumstances, we are unwilling to say that, as a matter of law, Irwin had no duty to obtain informed consent regarding plasmapheresis.

[12]Irwin essentially concedes that as of October 1984 it was a least a jury question whether the "known" risks of blood transfusions and plasmapheresis included the risk of AIDS. (*Valdiviez* v. *U.S.* (5th Cir. 1989) 884 F.2d 196, 197, 199-200 [whether risk of AIDS from blood transfusions had to be disclosed in October of 1984 a question of fact for the jury (summary judgment reversed)]; *Howell* v. *Spokane & Inland Emp. Blood Bk.* (1990) 114 Wn.2d 42 [785 P.2d 815, 819] ["[I]t was not until 1984 that the medical community reached a consensus that AIDS was transmissible by blood. [Citation.] The cause of AIDS, the HTLV-III virus, was identified in April 1984. [Citation.]"]; *Wilson* v. *Irwin Memorial Blood Bank, supra,* 14 Cal.App.4th at p. 1329 ["On March 27, 1984, Irwin issued a news bulletin announcing that it would begin anti-HBc testing [as surrogate testing for AIDS] on May 1."].)

*Avedon, supra,* 5 Cal.4th at p. 1190.) In addition to these "minimal" disclosures, the physician must also reveal to the patient "such additional information as a skilled practitioner of good standing would provide under similar circumstances."[13] (*Cobbs v. Grant, supra,* 8 Cal.3d at pp. 244-245, and quoted in *Arato v. Avedon, supra,* 5 Cal.4th at p. 1190.)

██ Most significant to this case, a physician is liable only where the failure to disclose *causes* the injury. (*Mathis v. Morrissey* (1992) 11 Cal.App.4th 332, 339 [13 Cal.Rptr.2d 819]; *Cobbs. v. Grant, supra,* 8 Cal.3d at p. 245.) "There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. *Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given."* (*Cobbs v. Grant, supra,* 8 Cal.3d at p. 245, italics added.) Moreover, causation must be established by an *objective* test: that is, the plaintiff must show that reasonable "prudent person[s]" in the patient's position would decline the procedure if they knew all significant perils. (*Mathis v. Morrissey, supra,* 11 Cal.App.4th at p. 339; *Cobbs. v. Grant, supra,* 8 Cal.3d at p. 245.)

██ Given the undisputed fact that both Mr. and Ms. Spann *knew* of the risk of AIDS from transfusion *before* Ms. Spann underwent plasmapheresis, and in light of the seriousness of her condition, we believe Mr. Spann has failed to raise a triable issue of fact that a reasonable person in the patient's position would have declined the treatment had full disclosure been made.

To reiterate, before Ms. Spann underwent plasmapheresis in October of 1984, both she and her husband knew that blood products could transmit AIDS. Moreover, although it is disputed whether Dr. Weil informed Ms. Spann of the risk of AIDS, Mr. Spann admits he spoke with Dr. Weil before the treatment and that Dr. Weil disclosed the risk of AIDS to him. Finally, the informed consent form Irwin gave to Ms. Spann before each treatment clearly indicated that it was possible "fresh plasma" would be transfused into her during the procedure. Thus, it is undisputed that Mr. and Ms. Spann were in fact aware of the "undisclosed" risk of the illness that caused Ms. Spann's death. "Evidence that plaintiff was aware of the risks despite [the physician's] failure to inform her relates directly to the question of whether she

---

[13]Generally expert testimony is not required to establish a failure to provide informed consent since the scope of disclosure is measured by what the *patient* needs to know, not by the standard in the professional community. However, in *Arato v. Avedon, supra,* 5 Cal.4th 1172, the Supreme Court recently held that the testimony of medical experts is relevant and admissible to establish "what, if any, disclosures—in addition to those relating to *the risk of death or serious injury and significant potential complications . . .* —would be made to the patient by a skilled practitioner in the relevant medical community under the circumstances . . . ." (*Arato v. Avedon, supra,* 5 Cal.4th at p. 1191, original italics.)

would have undergone the [procedure] despite a warning from defendant." (*Stone* v. *Foster* (1980) 106 Cal.App.3d 334, 351-352 [164 Cal.Rptr. 901].)

Having conceded that both he and his wife were aware of the risk of AIDS, Mr. Spann attempts to create a triable issue by contending that *other* disclosures should have been made as well. In particular, he contends that Irwin should have disclosed (1) the other treatments for TTP, such as treatment with steroids; (2) the steps that could be taken to reduce the risk of infection, such as a donor reduction program; and (3) the true number of plasma units his wife actually received during plasmapheresis.[14]

With respect to the first point regarding alternative treatments, under the doctrine of informed consent "there is no general duty of disclosure with respect to *nonrecommended* procedures . . . ." (*Vandi* v. *Permanente Medical Group, Inc.* (1992) 7 Cal.App.4th 1064, 1071 [9 Cal.Rptr.2d 463], italics added.) Instead, "the failure to recommend a procedure must be addressed under ordinary medical negligence standards. [Citation.]" (*Id.,* at p. 1070.) That is, a physician must disclose alternative treatments only to the extent it is required "for competent practice within the medical community." (*Id.,* at p. 1071.) The standard of care prevailing in the medical community must be established by expert testimony. (*Ibid.*) Here, Mr. Spann did not provide any expert evidence which established *the standard of care in the medical community* for disclosing alternative treatments for TTP. On the other hand, Irwin's expert stated that "[i]n October 1984, the appropriate medical therapy for the treatment of [TTP] was plasmapheresis with plasma infusion." Consequently, Mr. Spann did not raise a triable issue of fact on this point. (See also *Jambazian* v. *Borden* (1994) 25 Cal.App.4th 836, 849-850 [30 Cal.Rptr.2d 768].)

With respect to the alleged duty to disclose the possibility of a donor reduction program to reduce the risk of infection, no such program was in place for TTP patients undergoing plasmapheresis in October of 1984. As we have previously indicated, Irwin was not negligent for failing to offer such a program. Consequently, Irwin had no duty to "disclose" a program which did not exist and which it had no professional duty to maintain.

Finally, Mr. Spann contends Irwin should have disclosed the actual number of plasma units Ms. Spann received during her plasmapheresis. Mr. Spann complains that he relied on Dr. Weil's estimate that only about twenty

---

[14]We do not list Dr. Feldschuh's concern that Irwin failed to disclose the "high" possibility of contracting a *general* infection from the procedure itself, because we believe that concern is irrelevant in this case. Ms. Spann did not die because of the "high" general risk of infection, but because of the specific (and much lower) risk of AIDS.

units of blood products would be required, and that there was only a one-in-a-million chance of contracting AIDS from the procedure. However, as counsel conceded at oral argument, Mr. Spann provided *no evidence* that Dr. Weil's estimate of the chance of contracting AIDS was wrong.[15] Nor did he provide expert evidence on how *much* the odds of contracting AIDS would have increased, given that Ms. Spann received over 130 units rather than 20 units of blood products.

Although we recognize that Ms. Spann's death from AIDS was a great tragedy for her husband and family, her decision to undergo the procedure which caused that disease must be viewed in the context in which it was made. In October of 1984 Ms. Spann was faced with a serious disease which *immediately* threatened her life. She and Mr. Spann reasonably agreed to whatever treatments were necessary in order to defeat the immediate threat presented by that disease. Tragically, although the treatments defeated the immediate threat to Ms. Spann's life, they ultimately caused her death through the far less likely risk of HIV infection and AIDS. Nevertheless, no matter how we view the evidence, *at the time Mr. and Ms. Spann made their decision,* the risk of contracting AIDS from plasmapheresis was infinitesimal compared with the risk Ms. Spann faced from TTP. Given the gravity of the risk from TTP, we simply believe that any reasonable person—including Mr. and Ms. Spann—would have made the same decision to undergo plasmapheresis even if they had known that she was to receive over 130 units rather than 20 units of blood products. Consequently, in these circumstances we do not believe Mr. Spann has established a triable issue of fact on the issue of causation.

■ Although Mr. Spann states in his declaration that he and his wife would have sought other treatment had they been accurately informed of the risks of plasmapheresis and the availability of other treatments, this bald declaration is not sufficient to defeat summary judgment. As the *Cobbs* court itself noted, this issue "extends beyond [the] credibility" of the patient-plaintiff. "Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable . . . ." (*Cobbs* v. *Grant, supra,* 8 Cal. 3d at p. 245.)

[15]One court estimated that in January of 1983 there was a 1-in-3,500,000 chance of contracting AIDS from a blood transfusion. (*Kozup* v. *Georgetown University* (D.D.C. 1987) 663 F.Supp. 1048, 1053, revd. in part in *Kozup* v. *Georgetown University* (D.C. Cir. 1988) 851 F.2d 437, 440 [271 App.D.C. 182].)

In our view, Mr. Spann has not raised a triable issue of fact with respect to causation.[16]

The judgment is affirmed. Costs to respondents.

Merrill, J., and Corrigan, J., concurred.

---

[16]In deciding whether there is a triable issue of fact on causation, we have reviewed the entire record, including the evidence offered in support of Mr. Spann's motions for reconsideration and new trial. Irwin argues that we should disregard the evidence offered in support of the motions for reconsideration and for new trial because Mr. Spann failed to provide an explanation as to why he could not have produced this "newly discovered" evidence when he filed his original opposition. (See *Blue Mountain Development Co.* v. *Carville, supra,* 132 Cal.App.3d at pp. 1012-1014.) We need not decide this issue, because we conclude that the evidence in support of the motions for reconsideration and new trial fails to raise a triable issue of fact with respect to causation. (See *Thai* v. *Stang, supra,* 214 Cal.App.3d at pp. 1274, 1276-1277.)